**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL KELLER, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Plaintiff Demands Trial by Jury |
| | ) | |
| RETROPHIN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AT LAW FOR RETALIATION**
**UNDER THE ILLINOIS WHISTLEBLOWER ACT**

Michael Keller (herein "Plaintiff"), through his attorneys, Regas, Frezados & Dallas LLP and for his Complaint in Law against Retrophin, Inc. (herein "Retrophin" or "Defendant"), alleges as follows:

## Introduction

1. Plaintiff brings this action under the Illinois Whistleblower Act (740 ILCS 174 *et seq*.) to recover damages arising from Defendant's unlawful retaliation against Plaintiff for his refusing to engage violations of federal and state law, including, but not limited to: the federal Criminal Trespass statute (25 CFR 11.411); the Illinois Criminal Trespass to Real Property statute (720 ILCS 5/31-3); the Wisconsin Trespass to Land statute (Wis. Stat. §943.13) and Wisconsin Criminal Trespass to a Medical Facility statute (Wis. Stat. §943.145); the Minnesota Trespass Statute (Minn. Stat. §609.605); and the Iowa Damage and Trespass to Property statute (Iowa Code §716.8) (collectively herein "Trespass Laws"), and for his reporting of such violations.

2. Defendant Retrophin is a pharmaceutical company with its corporate headquarters

in San Diego, California. It transacts business nationwide, including in Cook County, Illinois.

3. Plaintiff is a resident of Illinois. At all times relevant hereto, Plaintiff has been employed as a sales representative for Defendant Retrophin, in the position of Clinical Account Manager. In the course of his employment with Defendant, Plaintiff has been assigned to market the prescription drug Cholbam in a geographic area covering the Chicagoland metropolitan area, as well as the States of Minnesota, Wisconsin, and Iowa (herein collectively "Plaintiff's Territory").

4. Cholbam is a prescription drug produced and sold by Retrophin for the treatment of certain rare bile acid synthesis disorders.

5. The violations in which Plaintiff refused to engage, and which Plaintiff reported, arise out of aggressive, unethical, and illegal marketing strategies employed by the Defendant, whereby Retrophin sales representatives are encouraged to, and, on information and belief, actually do, disregard applicable laws and ethical rules, and market Cholbam by "any means" possible, including, but not limited to, by illegally entering or remaining in restricted areas of hospitals and other medical facilities to market Cholbam to doctors located therein, in violation of applicable Trespass Laws.

6. Specifically, Plaintiff reported a September 13, 2017 act of trespass into a restricted area of the American Family Children's Hospital, a part of the University of Wisconsin Hospital system located in Madison, Wisconsin, in violation of federal and Wisconsin Trespass Laws, and repeatedly made clear to the Defendant that he was unwilling to engage in any similar legal or ethical violations in marketing Cholbam.

7. In addition to manifesting his general refusal to violate applicable laws or ethics,

Plaintiff also specifically refused to comply with, and reported, his superiors' instructions to trespass upon the restricted areas of various hospitals and medical facilities to which Plaintiff was unable to legally obtain access.

8. The acts in which Plaintiff refused to engage would have constituted violations of federal Trespass Law, as well as the state Trespass Laws applicable to each particular facility or hospital located in Plaintiff's Territory. Further, in the case of hospitals or medical facilities located in the City of Chicago, these acts would also have constituted violations of §4-6-310 of the Municipal Code of Chicago and §5 of the Chicago Pharmaceutical Representative License Rules.

9. At all times relevant hereto, Plaintiff has been one of Retrophin's top performing Cholbam sales representatives.

10. Prior to Plaintiff's refusal to engage in, and reporting of, illegal activity in the course of marketing Cholbam for Retrophin, he received overwhelmingly positive job performance feedback from the Defendant.

11. Following Plaintiff's refusal to engage in the aforementioned illegal activity, however, he began to receive uncharacteristically negative job performance feedback, despite the lack of any demonstrable change in his productivity, and was further given a final notice prior to termination. Shortly after Plaintiff reported the illegal activity pursuant to Retrophin's internal compliance procedures, he was also placed on a performance improvement plan, despite remaining one of Retrophin's top performing Cholbam sales representatives.

12. Since Plaintiff first began receiving negative job performance feedback, he has inquired, on multiple occasions, as to how precisely his performance is lacking, and how

he might improve, however, to date, he has received only vague, and at times contradictory, feedback from the Defendant in response to his inquiries.

13. Jurisdiction is conferred pursuant to 28 U.S.C. §1332(a)(1).

14. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred within this District.

**Applicable Law**

15. Pursuant to the Illinois Whistleblower Act, 740 ILCS 174 *et seq*., an employer may not retaliate against an employee for disclosing information which the employee has reasonable cause to believe constitutes a violation of a State or federal law, rule, or regulation (*Id*. at §15(a)), nor many an employer retaliate against an employee for refusing to participate in an activity which he or she has reasonable cause to belief would result in a State or federal law, rule, or regulation (*Id*. at §20).

16. Under federal Trespass Law, a person who enters or surreptitiously remains in any building despite knowing he or she is not licensed or privileged to do so (25 CFR 11.411(a)), or who enters or remains in any place as to which notice against trespass is given via actual communication or posting, despite knowing he or she is not licensed or privileged to do so (*Id*. at §11.411(b)(1) – (b)(2)), commits the offense of criminal trespass.

17. Under Illinois Trespass Law, a person commits criminal trespass to real property when he or she knowingly and without lawful authority enters or remains within a building (720 ILCS 5/21-3(a)(1)); enters upon the land of another despite prior notice that the entry is forbidden (*Id*. at §21-3(a)(2)); or remains upon the land of another after receiving notice to depart (*Id*. at §21-3(a)(3)).

18. Under Wisconsin Trespass Law, a person who enters the land of another without the express or implied consent of the owner or occupant (Wis. Stat. §943.13(1m)(a)), or who enters or remains on the land of another after having been notified by the owner not to enter or not to remain on the premises (Wis. Stat. §943.13(1m)(b)), is subject to a Class B Forfeiture. Further, a person who intentionally enters a Wisconsin medical facility without the consent of some person lawfully upon the premises, under circumstances tending to create or provoke a breach of the peace, commits criminal trespass to a medical facility. Wis. Stat. §943.145(2),

19. Under Minnesota Trespass Law, a person who intentionally occupies or enters another's locked or posted building, in a non-emergency situation, without claim of right or consent of the owner or someone who has the right to give consent, is guilty of a misdemeanor. Minn. Stat. §609.605(b).

20. Under Iowa Trespass Law, a person who enters property without consent of the owner, lessee, or person in lawful possession, with the intent to take various actions including, but not limited to, harassment (Iowa Code §716.7(1)), or who enters or remains upon property without justification after being notified or requested by the owner, lessee, or person in lawful possession, or their agent, not to enter or to remove themselves from the property (Iowa Code §716.7(2)), or who enters upon property for or with the effect of unduly interfering with the lawful use of the property by others (Iowa Code §716.7(3) commits a trespass, and any person who knowingly commits a trespass upon another's property is guilty of a simple misdemeanor (Iowa Code §716.8(1)).

**Plaintiff's Job Performance and Positive Performance Feedback**
**Prior to Expressing His Unwillingness to Engage in Illegal Activity**

21. Retrophin has, and at all times relevant to this cause of action, had, a total of twelve Cholbam sales representatives, including Plaintiff.

22. The job duties of Cholbam sales representatives, including Plaintiff, include, but are not limited to: identifying doctors with patients who may be suffering from the rare bile acid synthesis disorders which Cholbam has been approved to treat; educating doctors in the representative's assigned territory regarding these disorders and available testing and treatment therefor; providing testing kits and encouraging the testing of patients who may suffer from disorders treatable by Cholbam; and otherwise providing doctors with helpful information and diagnostic tools regarding Cholbam and the disorders it treats, with the ultimate objective of securing Cholbam prescriptions for patients who may benefit therefrom.

23. On information and belief, by the time of the events giving rise to Plaintiff's complaint, only one of Defendant's eleven other Cholbam sales representatives had secured more Cholbam-prescribed patients than Defendant. Also on information and belief, approximately seven to eight of the other Cholbam sales representatives had secured less patients than Defendant, with approximately three to four of them having secured no Cholbam patients whatsoever.

24. From the time Plaintiff was hired through October 15, 2017, Plaintiff received overwhelmingly positive feedback from the Defendant regarding his job performance.

25. For example, on June 2, 2017, less than three months after Plaintiff began his employment with Retrophin, Retrophin's National Sales Director Vince Wintermute

(herein "Wintermute"), a member of management in the chain of command above Plaintiff, emailed the entire Cholbam sales team, as well as members of Retrophin management, lauding Plaintiff for his exceptional efforts.

26. On June 3, 2017, another member of Retrophin management, Zone Business Director Bill Vasilko, replied all to Wintermute's email, and expressly thanked Plaintiff "for what you do."

**Plaintiff's Initial Refusals to Commit**
**Violations of Federal and State Law**

27. In the course of his employment, Plaintiff identified a pediatric gastroenterologist at the American Family Children's Hospital who was considering treating a particular patient with Cholbam: Dr. Daniel M. O'Connell (herein "Dr. O'Connell").

28. Plaintiff subsequently attempted to visit Dr. O'Connell at the American Family Children's Hospital regarding this patient, however, upon his arrival, he was advised by hospital staff that Dr. O'Connell's office was located in a restricted area which was closed to unauthorized personnel, and that he was not permitted to enter this area without first scheduling an appointment with Dr. O'Connell and then obtaining a badge from the hospital security desk. Lacking permission or authority to enter the restricted area of the hospital, Plaintiff was unable to meet with Dr. O'Connell at that time.

29. On or about September 13, 2017, Plaintiff and his manager, Holly Zickler (herein "Zickler"), went to the American Family Children's Hospital. Plaintiff had advised Zickler of his prior unsuccessful attempt to visit Dr. O'Connell, and specifically informed her that Dr. O'Connell's office was located in a restricted area of the hospital, which they were prohibited from entering without a prior appointment and a security badge.

30. Neither Zickler nor Plaintiff had an appointment to see Dr. O'Connell on September 13, 2017, nor had they otherwise requested or obtained permission to enter the restricted area in which his office is located. Nevertheless, Zickler insisted on proceeding directly past the busy security desk, entered the restricted area without consent or permission, and further proceeded directly to Dr. O'Connell's office, despite having been informed of the need for an appointment and badge, and despite commenting aloud that all other individuals in the elevator of the restricted area were wearing the required security badges.

31. Plaintiff ultimately complied with his manager's instructions on September 13, 2017, and allowed her to walk him into the restricted area of American Family Children's Hospital, however, upon their arrival, Dr. O'Connell was clearly perturbed by their unauthorized and unscheduled presence, and did not react favorably thereto.

32. Plaintiff subsequently informed Zickler that he was unwilling to enter any other restricted areas of hospitals or medical facilities without authority or permission, or to otherwise violate either hospital policy or applicable law.

33. In addition to the American Family Children's Hospital, numerous other hospitals and medical facilities throughout Plaintiff's Territory restrict access to, and require appointments to enter, doctor's offices and other designated areas. Such hospitals and medical facilities include, but are not limited to: other University of Wisconsin Hospitals; the University of Minnesota Medical Center; the University of Iowa Hospitals and Clinic; Lurie Children's Hospital; University of Chicago Medicine; Rush University Medical Center; Loyola Medical Center; University of Illinois Hospital; Advocate Health Systems; and North Shore University HealthSystem.

34. Plaintiff had reasonable cause to believe that the unauthorized September 13, 2017 access to the restricted area of American Family Children's Hospital constituted a violation of federal and Wisconsin Trespass law, and that obtaining unauthorized access to similarly restricted areas of other hospitals would constitute additional violations of federal Trespass Law and applicable state Trespass Laws.

**Defendant's Initial Retaliatory Actions**

35. The morning of October 16, 2017, shortly after Plaintiff had made clear to Defendant, through its agent, Zickler, that he would not trespass upon the restricted areas of hospitals or medical facilities, or commit any other illegal or unethical acts in the course of marketing Cholbam, the Plaintiff, Zickler, and Wintermute engaged in a discussion regarding what Zickler and Wintermute described as concerns regarding the Plaintiff's performance and "level of engagement."

36. During this conversation, Zickler and Wintermute alleged various deficiencies in Plaintiff's performance, focusing in particular on his failure to use "any means" possible to obtain face-to-face access to doctors. Zickler and Wintermute further informed Plaintiff that they believed he was at fault for a particular patient (herein "the Madison Patient") not having been prescribed Cholbam, as well as criticizing other aspects of Plaintiff's performance, including, but not limited to, his supposed failure to follow up and check in on particular patients and accounts in given timeframes.

37. None of the concerns raised by Zickler and Wintermute during their October 16, 2017 discussion had previously been addressed with Plaintiff.

38. Further, the majority of the alleged performance deficiencies alleged during this discussion either called for Plaintiff to engage in illegal and unethical activity; directly

contradicted prior instructions or feedback received from Zickler, Wintermute, and other members of Retrophin management; or were wholly inaccurate or unrealistic. For example:

(a) Plaintiff was criticized for inadequate face-to-face time with doctors, including numerous doctors whose offices are located in restricted areas which Plaintiff cannot legally enter without an appointment. In response, Plaintiff made clear that he was unable to obtain face-to-face access to such doctors unless they were willing to schedule an appointment, therefore requiring him to rely on other means of communication with doctors who were unwilling to agree to an appointment. He further informed Wintermute of the September 13, 2017 trespass into the restricted area of American Family Medical Center, as well as Dr. O'Connell's negative reaction thereto, and made clear that he had not and would not commit similar acts of trespass to other restricted areas. Wintermute, however, indicated that he saw no issue with obtaining unauthorized entry into restricted areas, explicitly instructing Plaintiff to attempt to obtain access to doctors "by any means" moving forward.

(b) Plaintiff was also criticized for his failure to follow up on certain test results, and on new diagnoses, in person, and within specific timeframes. However, Wintermute had previously explicitly instructed Plaintiff, and other Cholbam sales representatives, to follow up on the relevant test results over the phone only, rather than visiting doctor's offices in person. Further, Plaintiff had never been given any particular directive regarding the follow-up procedures or time frames for new diagnoses prior to this discussion, despite having kept both

Zickler and Wintermute apprised of his follow-up activities for each of his patients. On the contrary, Plaintiff had previously been praised by both Zickler and Wintermute after advising them of his past follow-up activities.

(c) Contrary to Zickler and Wintermute's allegations that the Madison Patient was not prescribed Cholbam through some fault of Plaintiff's, the Madison Patient's doctors had in fact made the determination that more serious conditions warranted treatment prior to addressing the patient's possible bile acid synthesis disorder. Specifically, Cholbam was initially not prescribed because the Madison Patient required open-heart surgery, which Zickler herself had been told by Dr. O'Connell. Subsequently, the patient required surgery for a cleft lip, which Dr. O'Connell similarly determined to be a higher treatment priority.

39. During their October 16, 2017 discussion, the Plaintiff raised multiple issues with the negative performance feedback then being provided by Zickler and Wintermute, and further indicated his refusal to use unethical or illegal means to obtain access to doctors.

40. The afternoon of October 16, 2017, Zickler emailed both the Plaintiff and Wintermute in follow up to their earlier conversation. While her email did summarize certain performance criteria which had in fact been discussed during their conversation, she also advised Plaintiff, for the first time, that her and Wintermute's concerns "necessitated moving to the next step in the performance management process," despite the fact that their alleged concerns themselves had only been raised with Plaintiff for the first time that same morning, and despite never having previously advised Plaintiff that any performance management steps were being taken.

41. Plaintiff was also advised of other alleged deficiencies in his performance for the first time in Zickler's email, including his alleged failure to add at least 7 new testers, and obtain a total of 23-25 tests, each month. However, Plaintiff had previously been advised that he was expected to reach these goals each quarter rather than each month and, on information and belief, no other Cholbam sales representative was or is required to meet these goals on a monthly, rather than quarterly, basis.

42. Between the conclusion of their discussion on the morning of October 16, 2017, and Plaintiff's receipt of Zickler's email that afternoon, Plaintiff had no other or additional communications with Zickler or with Wintermute regarding any of the issues addressed in their discussion, regarding the new issues raised in Zickler's email, or regarding any other aspect of his performance.

43. The uncharacteristically negative performance feedback provided by Zickler and Wintermute on October 16, 2017 constitutes retaliation for Plaintiff's refusal to engage in illegal and unethical acts of trespass upon restricted areas of medical facilities and hospitals. Further, the additional negative performance feedback set forth in Zickler's October 16, 2017 email, as well as the escalation to the "next step" of the performance management process, constitutes further retaliation for Plaintiff's ongoing refusal to engage in illegal and unethical activity, which he had clearly and unequivocally expressed to both Zickler and Wintermute earlier that day.

**Plaintiff's Response and Reporting of Illegal Activity**

44. On November 4, 2017, Plaintiff responded to Zickler's October 16, 2017 email.

45. In his email, Plaintiff expressed concern regarding his sudden, uncharacteristically negative performance feedback, particularly given that he had received primarily positive

feedback prior to October 16, 2017; was one of Defendant's most successful Cholbam sales representatives; had never previously been advised that any steps were being taken in the performance management process; and had previously been subjected to the same testing goals as other sales representatives, which were three times lower than the goals conveyed to Plaintiff in Zickler's email. In light of the foregoing, he further questioned whether Zickler and Wintermute's suddenly negative feedback was motivated by factors other than his actual performance.

46. The Plaintiff went on to address in detail the various inaccuracies, inconsistencies, and other deficiencies in the Zickler and Wintermute's suddenly negative feedback, including the issues previously set forth in Paragraphs 38(a)-(c), as well as the sudden imposition of testing goals which were three times higher than the goals then in place for all other Cholbam sales representatives.

47. The Plaintiff further pointed out that applicable laws and University polices either prohibit or severely limit his ability to meet certain criteria set forth by Zickler and Wintermute. For example, Zickler and Wintermute criticized the Plaintiff for not arranging enough speaking engagements for doctors, and for not arranging enough paid lunches and dinners for doctors. However, applicable law, including, but not limited to, applicable Anti-Kickback Statutes, as well as Minnesota's Sunshine Law—which expressly prohibits Minnesota doctors from accepting more than $50.00 of free gifts, including paid meals, per year—limit Plaintiff's ability to lawfully engage in lunches and other such activities to the degree demanded by Retrophin.

48. In the course of addressing these issues, the Plaintiff again described the September 13, 2017 trespass incident in detail, as well as Wintermute's instructions to

get in to see doctors "by any means," and again reiterated his refusal to access restricted areas of hospitals or medical facilities without appropriate authority or permission to do so.

49. The Plaintiff further made clear that, to the best of his knowledge, he had been complying with all prior performance objectives, to the extent permissible under applicable laws and ethical rules, and would continue to do so moving forward, and requested clarification as to whether or not he was being subjected to a more stringent set of requirements than his fellow Cholbam sales representatives, many of whom, on information and belief, were not meeting the stricter standards suddenly being imposed on Plaintiff.

50. Pursuant to Retrophin's Code of Business Conduct (herein "Code of Conduct"), employees are required to report any known or suspected Code of Conduct violations, including violations of laws, rules, regulations, or policies, as well as acts of retaliation against any employee who, in good faith, seeks help for, or reports, known or suspected violations of the Code of Conduct.

51. Plaintiff accordingly copied Bill Benvenuto (herein "Benvenuto"), Retrophin's Vice President of Legal Affairs and Chief Compliance Officer, on his November 4, 2017 email, thereby advising him of the September 13, 2017 trespass incident; of Wintermute's instructions to access doctors in restricted areas "by any means;" the sudden imposition of stricter standards on Plaintiff than on any other Cholbam sales representative; as well as Plaintiff's concerns that additional undisclosed factors may be motivating the sudden negative performance feedback.

52. Plaintiff had reasonable cause to believe that the information set forth in his

November 4, 2017 correspondence disclosed violations of applicable federal and state law, as well as Retrophin's own Code of Business Conduct.

53. Benvenuto acknowledged receipt of Plaintiff's email on November 6, 2017, acknowledged that no Retrophin employee should violate applicable law or ethical standards, and indicated that he wished to discuss the Plaintiff's concerns in further detail.

**Additional Retaliatory Action for Plaintiff's Reporting of Illegal Activity**

54. Despite Benvento's acknowledgement of Plaintiff's November 6, 2017 email, the Defendant failed to take reasonable action to either investigate or address any of the illegal activity or other Code of Conduct violations described therein, including the apparent retaliatory nature of Zickler and Wintermute's sudden negative feedback less than a month after Plaintiff expressed his unwillingness to violate the law or ethical rules, as well as the additionally negative feedback, and progression to the "next step" of the performance management process, immediately after Plaintiff had reiterated his refusal to engage in illegal or unethical activity.

55. Instead, the Defendant further retaliated against Plaintiff, by allowing Zickler and Wintermute, the subjects of Plaintiff's complaints, to not only remain in supervisory roles over the Plaintiff, but to continue to retaliate against him through escalated unwarranted negative feedback and performance management actions.

56. Specifically, on November 21, 2017, Zickler informed the Plaintiff that his performance had not improved, and placed Plaintiff on a 60 day performance improvement plan, in apparent retaliation for his refusal to engage in, and reporting of, illegal activity. Pursuant to Retrophin's company policy, performance plans are to be utilized when an employee's job performance is unsatisfactory, and such plans are

intended to be individually tailored for the particular employee and situation, with defined performance objectives for improvement.

57. Initially, Zickler's performance improvement plan falsely claims that she and the Plaintiff had discussed certain performance concerns on August 15, 2017, and again on October 3, 2017. Although Plaintiff and Zickler did speak on both of these occasions, at no time, during those conversations or otherwise, did Zickler raise the performance concerns alleged in her performance improvement plan.

58. The performance improvement plan then set forth concerns and expectations which were substantially identical to those raised by Zickler and Wintermute on October 16, 2017, without any acknowledgement of the Plaintiff's November 4, 2017 responses thereto. Further, to date, neither Zickler, Wintermute, Benvento, or any other agent of Defendant's have otherwise addressed any of the concerns raised by Plaintiff, nor has Plaintiff receive any answer or other response as to whether or not he was being subjected to a more stringent standard than all other Cholbam sales representatives.

59. The performance improvement plan did also identify some more specific performance concerns, including allegedly inadequate time spent traveling to various hospitals and financial institutions in Plaintiff's Territory, based on supposedly insufficient mileage logs, parking expenses, and scheduled trips; as well as allegedly inadequate follow up on certain test results. However, these additional alleged concerns are largely inaccurate or unreasonable, or hold Plaintiff to a different standard than had previously been conveyed to him.

60. For example, the bulk of the hospitals and other medical facilities in the Plaintiff's Territory are located in the Chicagoland area, and, although Plaintiff had never been

instructed to spend any particular amount of time travelling to other, more distant institutions, and had in fact been instructed to run his territory as he sees fit, the performance improvement plan concluded that Plaintiff had was not engaging in enough travel within Plaintiff's Territory. This conclusion was based, in part, on Plaintiff's car mileage, despite Defendant knowing that the Plaintiff also traveled via air and via Uber in certain areas of his territory, and on Plaintiff's low number of parking charges, despite the availability of paid parking at many of the institutions in Plaintiff's Territory, and despite Defendant's knowledge that Plaintiff requested parking validation when available, to avoid any unnecessary expense.

61. Further, although the performance improvement plan also criticized Plaintiff for failing to demonstrate the expected level of follow up activity, there were in fact no actionable test results in Plaintiff's Territory during the time in question, such that Plaintiff could have conducted the supposedly-lacking follow up activities. Additionally, on the one occasion when a possible patient was identified, the Plaintiff had discussed how best to follow up with Zickler, and had proceeded accordingly.

62. Plaintiff's placement on a performance improvement plan, particularly one with inaccurate, unreasonable, and inconsistent feedback and requirements, constitutes retaliation for Plaintiff's ongoing refusal to engage in illegal and unethical acts of trespass upon restricted areas of medical facilities and hospitals, or to pressure doctors to accept speaking engagements or paid lunches in violation of applicable law, as well as for his reporting of known and suspected violations of applicable laws and ethical rules pursuant to Defendant's own Code of Conduct.

63. Further, Zickler's retaliatory placement of Plaintiff on a performance improvement

plan is particularly egregious given that the Plaintiff received no feedback or other instruction whatsoever regarding his performance since October 16, 2017, despite Zickler having assured the Plaintiff on that date that she would be regularly following up with him over the next 30 days. On the contrary, Plaintiff and Zickler had only one conversation regarding his performance during this time, which consisted entirely of Plaintiff updating Zickler on his recent activity, with no feedback or further instruction from Zickler.

**COUNT I: Retaliation under the Illinois Whistleblower Act**

64. The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

65. Plaintiff had a reasonable, good-faith belief that the sales tactics he was instructed to use by Defendant violated the law, and repeatedly refused to engage in such tactics.

66. Plaintiff further had a reasonable, good-faith belief that the conduct he reported to Retrophin, pursuant to Defendant's own Code of Conduct, violated the law.

67. To date, Retrophin has failed to provide Plaintiff with any information as to the result of any investigation into his complaints and, on information and belief, has failed to conduct any such investigation.

68. Instead, Retrophin retaliated against Plaintiff, first through Zickler and Wintermute's unfounded negative performance feedback following Plaintiff's refusal to engage in illegal activity; then again through the additional negative performance feedback and escalation of the performance management process when it became apparent that Plaintiff intended to persist in his refusal to engage in illegal activity; and yet again by allowing the subjects of Plaintiff's complaint to continue to supervise him, and to place him on a retaliatory performance improvement plan, even after Plaintiff had

reported his superiors' various illegal conduct, and their instructions to engage in illegal conduct.

69. As a direct and proximate consequence of Plaintiff's refusal to violate applicable law, and of his disclosure of information he reasonably believed to disclose violations of applicable law, Defendant wrongfully retaliated against Plaintiff through actions which would be materially adverse to any reasonable employee.

70. Retrophin lacked an overriding legitimate business objective for taking negative actions affecting Plaintiff's employment.

71. There is a clear public policy in the State of Illinois favoring the protection of employees from unlawful retaliatory acts by their employers. There is also a clear public policy in the State of Illinois favoring adherence to federal and state statutes.

72. Permitting employers such as Retrophin to retaliate against employees such as Plaintiff for refusing to violate applicable law, or for internal reporting such violations as required by the employer's own policies and procedures, would jeopardize these public policies.

73. As a result of Defendant's wrongful retaliation, Plaintiff has suffered damages, including financial damages in the form of lost compensation as a result of Defendant's wrongful retaliatory performance reviews of Plaintiff, and all fees, costs, and expenses incurred in pursuing this action.

74. Plaintiff seeks to recover all damages arising for Retrophin's wrongful retaliation against Plaintiff in violation of the anti-retaliation provisions of the Illinois Whistleblower Act, 740 ILCS 174/*et seq*.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests:

A. That the Plaintiff be awarded all damages caused by Defendant's retaliation of Plaintiff, including but not limited to two times the amount of back pay owed, interest on such back pay, lost benefits, and compensatory damages, in a sum in excess of $75,000.00;

B. That the Plaintiff be awarded all prejudgment interest to which Plaintiff is entitled;

C. That Plaintiff be awarded all costs, attorneys' fees, and litigation expenses;

D. That the Plaintiff receive all other relief, both at law and in equity, to which he may be entitled.

Respectfully submitted,

/s/ William D. Dallas
*Counsel for Plaintiff*

William D. Dallas
Sara Engbretson
Regas, Frezados & Dallas LLP
20 N. Clark St. Suite 1103
Chicago, IL 60602
(312) 236-4400
Attorney No. 08189